IN THE UNITED STATES DISTRICT COURT
FOR CONNECTICUT

IN THE MATTER OF THE SEARCH OF :    No. 3:24-mj-____271____(SDV)
ONE BLACK CELL-PHONE WITH "BLU"
ON THE BACK AND ONE BLACK APPLE
I-PHONE SEIZED FROM JERMEL BATES
ON MARCH 19, 2024. :

United States District Court
District of Connecticut
FILED AT BRIDGEPORT
____March 26____ 20 24

**AFFIDAVIT**

By *Djess Jacques*
Deputy Clerk

    I, Calvin DeVries, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application for a search warrant for information associated with a black in color I-Phone with two cameras on the back and a black in color cellphone with "BLU" labeled on the back, hereinafter referred to as the "Subject Phones," seized during the arrest of JERMEL BATES on March 19, 2024. The information to be searched is described in the following paragraphs and in Attachment A.

2.    I am a Special Agent with the Federal Bureau of Investigation (hereinafter the "FBI") and have been since June 2021. I am currently assigned to the New Haven Field Office of the FBI, and, in particular, to the Bridgeport Safe Streets Task Force ("Task Force"), which is comprised of personnel from the FBI, Bridgeport Police Department, Norwalk Police Department, Connecticut State Police, and the Trumbull Police Department. The nature of the investigations the Task Force conducts includes investigations into firearms offenses, narcotics offenses, racketeering crimes, and violent crimes.

3.    I am a graduate of the FBI Training Academy in Quantico, Virginia where I received training in diverse criminal matters, interviewing, interrogation, evidence collection, intelligence analysis, and legal matters, among other topics. Prior to joining the FBI, I was employed as a law

1

enforcement officer with the United States Secret Service Uniformed Division from 2018-2021. During my employment with the United States Secret Service, I held the position title of Police Officer. Throughout my employment with the United States Secret Service, I conducted and assisted with investigations into traffic stops, driving offenses, assaults, thefts, and property crimes, among other topics.

4.      During my time as an FBI special agent, I have participated in multiple criminal investigations, including investigations into suspected homicides, armed robberies, narcotics trafficking, firearms trafficking, violent criminal activity, racketeering, and money laundering. My participation in these investigations has included assisting in the controlled purchase of narcotics utilizing confidential sources, participating in the execution of search and arrest warrants, conducting electronic and physical surveillance, analyzing records related to narcotics trafficking, and reviewing and analyzing cellular records and cell site information. I have assisted in investigations into organized criminal enterprises, including violent street gangs and large-scale narcotics trafficking organizations.

5.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I have personally participated in the investigation concerning violations of the federal laws listed herein.

6.      As part of my duties, I am currently participating in an investigation into criminal conduct involving a group of individuals known to be a part of the Rollin 30's Crips gang. The "Rollin 30's" primarily were based within the Colonial Village Housing Project on the west side of Norwalk, CT, but now are living and operating around the greater Fairfield County area. The

Rollin 30's are affiliated with the nationally recognized street gang "The Crips." Many members of the Rollin 30's have long histories of violence and drug-related activity.

7.      I have participated in this investigation and, as a result of my participation and information received from other law enforcement officers, including agents of the FBI, Agents from the Drug Enforcement Administration ("DEA"), Officers and Detectives from Bridgeport Police Department ("BPD"), and Officers and Detectives from Norwalk Police Department ("NPD") (collectively referred to as "law enforcement"), I am thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit. The statements contained in this affidavit are based on: (1) my personal participation in the investigation; (2) information provided to me by law enforcement; and (3) my experience and training. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all my knowledge about this matter.

8.      I am currently investigating JERMEL BATES, a/k/a "Mel Kitty" or "Kitty," for violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 841(b)(1)(C) (possession with the intent to distribute controlled substances, including fentanyl, cocaine, and heroin) (the "TARGET OFFENSES"). This affidavit is submitted in support of a search warrant for two phones, which were found on the person of BATES at the time of his arrest on March 19, 2024.

9.      I have reviewed BATES's criminal record. BATES has several felony convictions in Connecticut Superior Court, including Possession of Narcotics with Intent to Sell on August 14, 2019 (he was sentenced to 21 months' imprisonment), and Sale of Narcotics (Heroin) on November 2, 2016 (he was sentenced to 4 years' imprisonment).

## THE JUNE 25, 2023 NARCOTICS

10.     During the early morning hours of June 25, 2023, Bridgeport Police Officers Nathan

Fowler, Rory Anderson, and Israel Colon responded to 16 Summerfield Avenue in Bridgeport, Connecticut on a report of a Motor Vehicle Accident involving a blue Nissan Altima (CT REG: BH09540). A complainant had notified BPD dispatch that the operator of the Nissan Altima had fled the scene following the accident. When they arrived at 16 Summerfield, the BDP officers found the Nissan Altima where it had crashed into the rear end of a Silver 2013 Lincoln MKX, CT REG: AZ56094. The officers observed that heavy damages were sustained to the front of the Nissan. They also observed blood-like substances within the exterior and interior of the vehicle.

11.     Through investigative measures, Officer Fowler received from an eyewitness a video of a black male and female exiting the Nissan before they fled the scene. Officer Fowler contacted BPD dispatch to check both Bridgeport and St. Vincent Hospitals for injuries consistent with a motor vehicle accident.

12.     Consistent with BPD policy as to abandoned vehicles, the BPD officers conducted an inventory search of the vehicle in preparation for the vehicle to be towed. Located within the vehicle's glove box was the registration and insurance cards, as well as multiple plastic-wrapped, sealed contraband items and a prescription pill bottle with the name of "BATES Jr, Jermel" on it. Officer Fowler collected all evidence with gloved hands and placed them into an evidence bag. As he removed the evidence from the glove box, he photographed each item, which included:

- One (1) clear sandwich bag containing an off-white rock like substance. This item was tested using NARK kit #07, which yielded a positive reaction to the presence of crack/cocaine and fentanyl.

- Eleven (11) clear, twisted plastic baggies, each containing blue-green pills stamped "M/30." In total, the eleven baggies contained approximately 550 pills.

- More than 500 wax paper folds with a blue stamp "be happy," each containing a white powdery substance. This item was tested using NARK kit #33, which yielded a positive reaction to the presence of heroin and fentanyl.

13.    These items were sent to the State of Connecticut Department of Emergency Services and Public Protection Laboratory for testing. Based on the manner in which the items were packaged, the quantity, and the BPD Officers' training and experience, the BPD Officers had probable cause to believe that they were not being consumed by JERMEL BATES for personal use.

14.    On January 12, 2024, the State of Connecticut Department of Emergency Services and Public Protection provided a Laboratory Report to Bridgeport Detective Timothy Leonard on the drug items submitted for testing. The results showed the following:

**Item 1:** The off-white, rock like substance tested positive for 78.976 grams of cocaine free base.

**Item 2:** The lab tested a single blue pill stamped "M/30" from each of the 11 baggies, and all eleven pills tested positive for fentanyl. The total weight of the approximately 550 pills was approximately 60.286 grams.

**Item 3:** The wax paper folds stamped "be happy" tested positive for heroin, fentanyl, and an unknown form of cocaine. The total weight of this item was over twelve grams.

15.    The State of Connecticut Department of Emergency Services and Public Protection Division of Scientific Services issued a Latent Print Unit Report that confirmed BATES's fingerprint impressions on three (3) of the eleven (11) clear twisted plastic baggies containing blue-green tablets, which were labeled in the Latent Print Unit Report as items 002-001 through 002-011. Specifically, the results confirmed that JERMEL BATES (DOB:11/22/1995) left a left index finger impression on items 002-002-L1 and 002-003-L1 and a right middle finger

impression on item 002-010-L1.

16.     BPD Officers conducted a DMV records check for the blue Nissan Altima, CT registration BH09540, and the results revealed that the vehicle was registered to BATES with no insurance.

17.     Meanwhile, on June 25, 2023, BPD Officer Michael Swix was assigned to a report of an assault in which the patient's injuries were consistent with being involved in a motor vehicle accident. The patient was at Bridgeport Hospital. BPD Officer Fowler conducted a follow up to the Bridgeport Hospital Family Room and spoke to a female, later identified as CHARNESSA ORTIZ, who was a passenger involved in the crash. Ortiz first stated that she and her boyfriend, BATES, had gotten into a fight at a gas station. When asked if she knew who they fought, Ortiz said "I don't know." Ortiz later stated that after BATES picked her up in his car, they were followed by a suspicious vehicle. BATES was "scared, he didn't know what to do," so he "sped off" and fled from the suspected vehicle. BATES turned a corner, crashed his vehicle, and then they fled on foot towards Bridgeport Hospital for medical attention. Ortiz stated she was unaware of where she was located at the time of the crash.

18.     Ortiz claimed multiple times that she did not know that there were narcotics in the vehicle. She also claimed that her boyfriend never sold drugs or came across drugs in his life. Ortiz said she has been in a relationship with BATES for twelve (12) years and she further stated that he did not have any ties to the contraband in the car. Officer Fowler asked her if she had any idea as to how the drugs got inside the glove box, and she stated "No." Ortiz had multiple small lacerations to her face and arms; however, she stated that she refused medical attention from hospital staff.

19.     BPD Officer Swix and Officer Fowler (the "Officers") then interviewed BATES and

asked him what transpired prior to the accident. BATES said he only remembered crashing his vehicle and walking into the E.R. of Bridgeport Hospital asking for medical assistance, but nothing in between. The Officers told BATES that they found narcotics in his car and asked if he knew who they belonged to, and he at first stated "No." However, once the Officers advised him that the drugs were on the passenger side where Ortiz had been sitting, and that there was a possibility that she could be charged in connection with the drugs, BATES told the Officers that they did not belong to Ortiz and that they were his drugs.

20.     BATES stated that he was the operator at the time of the accident, that the vehicle belongs to him, and that he is the owner of the contraband located in the passenger glove box. These statements, and those of Ortiz, were captured on the body-worn camera of the BPD officers. Following BATES's statements, the Officers placed BATES in handcuffs (checked for proper fit) and notified him that he would be processed and booked after being released from the hospital.

21.     BATES had sustained a laceration to his left eyebrow and upper face as well as a large contusion to his left cheek and left eye. Due to his injuries, he was admitted into Bridgeport Hospital for further evaluation, but was released later that day and charged in Connecticut Superior Court with various offenses, including three counts of possession of controlled substances with intent to sell. He was released on a $125,000 bond.

## THE MARCH 19, 2024 FEDERAL ARREST

22.     In March of 2024, the FBI, together with this affiant, conducted a pattern of life surveillance on BATES in anticipation of applying for a federal arrest warrant. The FBI learned through a confidential source on or about February 29, 2024, that BATES was living with Ortiz on Newfield Avenue in Bridgeport, Connecticut. A DMV records check confirmed that Ortiz

lives at 584 Newfield Avenue, Third Floor, Bridgeport, Connecticut 06607. Through investigative techniques—including physical surveillance—the FBI also learned that BATES was using a rental blue Honda Accord, CT registration BK47885, VIN: 1HGCP2F33BA024121, as his primary vehicle.

23.      During the period of surveillance, the FBI observed BATES leaving and returning to 584 Newfield Avenue on multiple occasions.

24.      On March 12, 2024, at approximately 2:00 p.m., this affiant and another FBI TFO observed BATES leaving 584 Newfield Avenue in the blue Honda Accord, followed him to Fremont Street in Bridgeport, Connecticut, and observed BATES park on the north side of the street. BATES was alone in his vehicle when he parked the car. This affiant surveilled BATES by looping around the block and, approximately two minutes later, returned to Fremont Street to observe an unidentified female, who had not been in the vehicle two minutes prior, exit BATES's vehicle from the passenger seat and enter a silver Honda Civic. Based on my training and experience, the short time period in the passenger's seat of the car (less than two minutes), BATES's history, and discussions with the agents who surveilled BATES previously, there is probable cause to believe, and I do believe, that BATES was engaged in a hand-to-hand narcotics sale during this time.

25.      On March 18, 2024, the Hon. S. Dave Vatti, United States Magistrate Judge, District of Connecticut, issued a warrant authorizing the FBI to arrest BATES for committing the TARGET OFFENSES. *See* 24-mj-234 (SDV).

26.      At approximately 10:30 a.m. on March 19, 2024, this affiant, the FBI, and the BDP set up surveillance at 584 Newfield Avenue, Bridgeport, Connecticut, for the purpose of serving the arrest warrant. At approximately 12:57 p.m., BATES emerged from the front door of 584

Newfield Avenue, walked towards the blue Honda Accord, and got into the driver's seat of the vehicle. Law enforcement personnel converged on BATES and the vehicle and arrested BATES. A search incident to arrest was conducted on BATES.

27.     During the search incident to arrest of BATES's person, law enforcement located keys, a black in color cell-phone with "BLU" labeled on the back, a black in color Apple i-Phone (the Subject Phones), a plastic bag with approximately 10 wax paper folds with suspected heroin— consistent with the wax paper folds found in BATES's vehicle on June 25, 2023—two additional plastic bags each with multiple blue-green pills stamped "M/30" with suspected fentanyl— consistent with the pills found in BATES's vehicle on June 25, 2023—and a clear plastic bag with a small quantity of marijuana. Based on the manner in which the items were packaged, the quantity, and my training and experience, I believe that the narcotics were not being consumed by BATES for personal use. Additionally, BATES's prior arrest and history indicate to me that he continued his narcotics sales immediately after his arrest on state charges.

28.     I know, based upon my training and experience, that drug dealers sometimes segregate various aspects of their illicit business, and use different telephones to handle the various aspects of their operation to thwart law enforcement and insulate themselves and their confederates. For example, drug dealers often use one phone to communicate with customers and another phone to communicate with their source(s) of supply. In addition, drug dealers often use different phones to deal with different "lines" of customers. For example, a drug dealer may use one phone to communicate with customers who regularly purchase small, pre-packaged quantities of narcotics and another phone for customers who regularly purchase larger quantities. Or, a drug dealer may use different phones to distribute different types of narcotics. Similarly, drug dealers whose business extends into multiple states, also sometimes use one phone for local customers and

another phone for out-of-state customers. Finally, drug dealers often utilize two or more cellular telephones interchangeably for all their narcotics trafficking undertakings. This enables drug dealers to accommodate a high volume of narcotics trafficking calls. The use of two or more phones interchangeably also enables distributors to immediately terminate service on one phone – if they believe the phone is being targeted by law enforcement – without crippling their illegal business.

29.     The Subject Phones seized from BATES remained powered on and placed into airplane mode.

## SEARCH OF BATES'S RESIDENCE

30.     Fellow law enforcement officers tested the keys found on BATES's person at 584 Newfield Avenue, and determined the keys were capable of unlocking the door to Apartment 3.

31.     On March 19, 2024, FBI Task Force Officer Kyle Lipeika swore out an affidavit, which was signed by the Honorable S. Dave Vatti, authorizing a search and seizure warrant for 584 Newfield Avenue, Third Floor, Apartment 3, Bridgeport, Connecticut 06607.

32.     This affiant conducted a post arrest interview of BATES on March 19, 2024. During the interview BATES advised this affiant that if anything was found by law enforcement inside of the apartment, it was his. BATES further stated he had approximately 50 to 100 pills in his bedside table inside the apartment.

33.     Law enforcement conducted a search of 584 Newfield Avenue, Floor 3, Apartment 3, and the following drugs were seized from the apartment:

- Approximately 474.3 grams of blue pills stamped with "M/30" – similar to the pills found in Bates's vehicle on June 25, 2023, and the pills on BATES's person at the time

of his arrest on March 19, 2024. The blue pills were field tested and returned with a positive result for the presumption of fentanyl.

- Approximately 164.9 grams of white folds with a white powdery substance inside of them, presumed to be heroin/fentanyl. The folds appeared to be prepackaged with black rubber bands holding them together. The folds were field tested and returned with a positive result for the presumption of fentanyl.

- Approximately 12.3 grams of a white rock-like substance, presumed to be crack cocaine. The white rock-like substance was field tested and returned with a positive result for cocaine.

## INFORMATION REGARDING CELLULAR TELEPHONES AND THE REQUESTED SEARCH WARRANT

34.     Based upon the totality of the facts and circumstances set forth herein, and based on my training and experience and consultations with fellow law enforcement officers, I know:

   a. that narcotics traffickers possess and use cellular telephones to facilitate, and in furtherance of, their drug trafficking activity;

   b. that narcotics traffickers maintain their cellular telephones on their person and/or store them inside their residences where they are readily accessible in order to maintain timely communication with customers, sources of supply, and other members of their drug trafficking organizations/networks;

   c. that narcotics traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones;

   d. that narcotics traffickers often segregate various aspects of their illicit business, and use different telephones to handle the various aspects of their operation to thwart law

enforcement and insulate themselves and their confederates. For example, narcotics traffickers may use one phone to communicate with customers and another phone to communicate with their source(s) of supply. In addition, narcotics traffickers often use different phones to deal with different "lines" of customers. For example, narcotics traffickers may use one phone to communicate with customers who regularly purchase small, pre-packaged quantities of narcotics and another phone for customers who regularly purchase larger quantities. Or narcotics traffickers may use different phones to distribute different types of narcotics. Finally, narcotics traffickers may utilize two or more cellular telephones interchangeably for all their narcotics trafficking undertakings to enable them to accommodate a high volume of narcotics trafficking calls. The use of two or more phones interchangeably also enables distributors to immediately terminate service on one phone – if they believe the phone is being targeted by law enforcement – without crippling their illegal business;

e.   that narcotic traffickers commonly maintain addresses or telephone numbers in cellular telephones, which may reflect names, addresses and/or telephone numbers of their clients and associates in the drug trafficking organization. Traffickers also maintain photographs and video of participants and associates in narcotic trafficking activity, and property acquired as a result of narcotics trafficking activities. Drug distributors also communicate with their criminal associates via text message and also various encrypted applications such as WhatsApp and they frequently make use of and maintain multiple cellular telephones to compartmentalize operations and upon which those text messages and encrypted communications often remain stored; and

f.  that narcotics traffickers frequently use cellular telephones subscribed to other persons and pre-paid cellular telephones that require the purchaser to provide little or no identifying information to purchase and utilize the phone, all of which is done in an effort to avoid detection and thwart the efforts of law enforcement.

35.  Based on my training and experience, and as set forth in this affidavit, I know that cellular telephones are used by individuals who are involved in criminal acts to communicate regarding their criminal activities, and I have probable cause to believe that the **Subject Phones** were used by JERMEL BATES to communicate criminal activity related to the Subject Offenses. I further believe that there may be communications on the **Subject Phones** relating to potentially other co-conspirators. I therefore request permission to search the **Subject Phones** for evidence of the Subject Offenses and also evidence of potential other co-conspirators.

36.  Based on my training and experience, I know that the **Subject Phones** may have some or all of the capabilities that allow each one to serve as a wireless telephone, digital camera and video recorder, portable media player, global positioning system navigation device, hand-held radio, and a personal digital assistant. In my training and experience, examining data stored on devices like the **Subject Phones** can uncover, among other things, evidence that reveals or suggests who possessed or used the particular device, as well as evidence relating to other persons with whom the device's user was in contact.

37.  Furthermore, based on my training and experience, I know that internet browsing history stored on cellular telephones can contain evidence of text communications between persons who conspire to commit criminal activity together. Based on my training and experience, I also know that internet browsing history stored on cellular telephones can contain evidence of internet searches for locations and addresses. Specifically, based on my training and experience, I know

13

the following information tends to exist on cellular telephones, including telephones used by those committing criminal acts:

     a.     the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of said telephone;

     b.     the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

     c.     descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

     d.     any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

     e.     any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

     f.     GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

     g.     saved searches, locations, and route history in the memory of said devices;

     h.     internet browsing history, to include, internet searches in the memory of said device; and

     i.     images and videos in the memory of said device.

38.     It is requested that the Court authorize law enforcement agents to retrieve the above-described stored electronic information by printing said stored electronic information or

14

otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device. I am aware that in some cases the software or equipment necessary to analyze cellular telephones in this manner is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant. Further, turning on cellular phones in a non-laboratory setting, where there is no "jammer" or radio shielding devices, permits additional signals to be received by the telephone and thereby alters the data present in the phone at the time of seizure. Therefore, it is often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted. It is also requested that the requested search warrant be deemed executed once the **Subject Phones** has been seized in the manner described above, and that further analysis of the images be permitted at any time thereafter.

Respectfully submitted,

CALVIN DEVRIES
Digitally signed by CALVIN DEVRIES
Date: 2024.03.26 11:28:54 -04'00'

CALVIN DEVRIES
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to me through the transmission of this Affidavit by reliable electronic means, specifically by telephone, pursuant to Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this 26th day of March, 2024.

S. Dave Vatti
Digitally signed by S. Dave Vatti
Date: 2024.03.26 16:12:36 -04'00'

HON. S DAVE VATTI
UNITED STATES MAGISTRATE JUDGE

15

## <u>ATTACHMENT A-1</u>

**Property to Be Searched**

The property to be searched is a black Apple iPhone seized by the FBI from JERMEL BATES on March 19, 2024, which is presently in the custody of the Federal Bureau of Investigation in Bridgeport, Connecticut.

## <u>ATTACHMENT B-1</u>

### Particular Things to Be Seized

All records and information contained in the **black Apple iPhone**, for the time period June

1, 2023 through March 19, 2024, to include the following:

1. the telephone number, ESN number, serial number, and SIM card number of the telephone;
2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the telephone;
3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), and 841(b)(1)(C) (possession with the intent to distribute controlled substances, including fentanyl, cocaine, and heroin);
4. any and all records, however created or stored, which tend to demonstrate ownership and use of the devices, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the telephone;
5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the telephone, such as passwords, sign-on codes, and program design;
6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;
7. saved searches, locations, and route history in the memory of said telephone;
8. internet browsing history, to include internet searches in the memory of the telephone;
9. images and videos in the memory of the telephone; and
10. evidence of user attribution showing who used or owned the telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of

evidence in whatever form and by whatever means they may have been created or stored, including

any form of computer or electronic storage (such as flash memory or other media that can store

data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described telephone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device(s).

## <u>ATTACHMENT A-2</u>

### Property to Be Searched

The property to be searched is a black in color cell phone with "BLU" on the back seized by the FBI from JERMEL BATES on March 19, 2024, which is presently in the custody of the Federal Bureau of Investigation in Bridgeport, Connecticut.

## <u>ATTACHMENT B-2</u>

### Particular Things to be Seized

All records and information contained in the **black cell phone**, for the time period June 1, 2023 through March 19, 2024, to include the following:

1. the telephone number, ESN number, serial number, and SIM card number of the telephone;
2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the telephone;
3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), and 841(b)(1)(C) (possession with the intent to distribute controlled substances, including fentanyl, cocaine, and heroin);
4. any and all records, however created or stored, which tend to demonstrate ownership and use of the devices, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the telephone;
5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the telephone, such as passwords, sign-on codes, and program design;
6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;
7. saved searches, locations, and route history in the memory of said telephone;
8. internet browsing history, to include internet searches in the memory of the telephone;
9. images and videos in the memory of the telephone; and
10. evidence of user attribution showing who used or owned the telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described telephone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device(s).